UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2025 OCT -7 PM 4: 41

CLERK

BY⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
DEPUTY CLERK

MICHELLE H.,                              )
                                         )
        Plaintiff,                        )
                                         )
    v.                                    )        Case No. 2:24-cv-748
                                         )
FRANK J. BISIGNANO,[1]                    )
COMMISSIONER OF SOCIAL                    )
SECURITY,                                 )
                                         )
        Defendant.                        )

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR AN ORDER REVERSING THE DECISION OF THE COMMISSIONER AND DENYING THE COMMISSIONER'S MOTION TO AFFIRM AND REMANDING FOR FURTHER PROCEEDINGS**
(Docs. 12 & 18)

Plaintiff Michelle L. Hayford ("Plaintiff") is a claimant for Social Security Disability Insurance Benefits ("DIB") under the Social Security Act ("SSA") and brings this action pursuant to 42 U.S.C. § 405(g) to reverse the decision of the Social Security Commissioner (the "Commissioner") that she was not disabled for the period claimed.[2] (Doc. 12.) The Commissioner moves to affirm. (Doc. 18.) Plaintiff replied on April 18, 2025, at which time the court took the pending motions under advisement.

After Plaintiff's application for DIB was denied initially and on reconsideration by

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[1] On May 7, 2025, Frank J. Bisignano became the Commissioner of Social Security. The Clerk's Office is respectfully directed to substitute him as the Defendant. *See* Fed. R. Civ. P. 25(d).

[2] Disability is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or mental impairment or impairments" must be "of such severity" that the claimant is not only unable to do any previous work but cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

the Social Security Administration, Administrative Law Judge ("ALJ") Tracy LaChance found Plaintiff ineligible for benefits based on her conclusion that Plaintiff was not disabled within the meaning of the SSA.

Plaintiff identifies three errors in the disability determination: (1) the ALJ failed to evaluate her fibromyalgia under Social Security Ruling 12-2p; (2) the ALJ failed to properly assess the supportability and consistency of her treating sources' opinions with each other and the record; and (3) the ALJ failed to make findings regarding off-task time, work absences, and the need for additional rest breaks.

Plaintiff is represented by Arthur P. Anderson, Esq. The Commissioner is represented by Special Assistant United States Attorneys Jason P. Peck and John Molinaro.

## I.    Procedural History.

Plaintiff filed her application for DIB on June 8, 2022, alleging disability beginning July 10, 2020, based on fibromyalgia, chronic pain, depression, anxiety, chronic fatigue, brain fog, dizziness, long COVID, joint and nerve pain, and difficulty sleeping. Her claim was denied initially on July 8, 2022, and was denied upon reconsideration on November 7, 2022. Plaintiff timely filed a request for a hearing, which was held before ALJ LaChance via videoconference on May 4, 2023. Plaintiff appeared via online video and was represented by Meriam Hamada, a non-attorney representative. Both Plaintiff and Vocational Expert ("VE") Whitney Eng testified.

On August 23, 2023, ALJ LaChance issued an unfavorable decision. Plaintiff timely filed an administrative appeal. The Appeals Council denied review on May 7, 2024. As a result, the ALJ's disability determination stands as the Commissioner's final decision. Plaintiff has appealed that order to this court.

## II.    ALJ LaChance's August 23, 2023 Decision.

Plaintiff was forty-seven years old on the last date insured and forty-nine at the time of the ALJ's decision. The ALJ found that Plaintiff has at least a high school education and her past employment includes work as a "Home Attendant" at a medium exertional level. (Doc. 5-1 at 28.) Plaintiff testified that her symptoms began around

2015. She described her pain as "an all over achy, deep muscle kind of pain which comes with headaches [and] brain fog." *Id.* at 50-51. She testified that her symptoms affected her work because she "couldn't bend as much[] and [she] couldn't transfer patients. [She] was losing the strength in [her] arms due to the pain" and also developed panic attacks. *Id.* at 51. As a result, she reduced her work to part-time.

In order to receive DIB under the SSA, a claimant must be disabled on or before the claimant's date last insured. A five-step, sequential-evaluation framework determines whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at [S]teps [O]ne through [F]our of the sequential five-step framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and citation omitted). At Step Five, "the burden shifts to the Commissioner to show there is other work that [the plaintiff] can perform." *McIntyre*, 758 F.3d at 150 (alterations adopted) (internal quotation marks omitted).

At Step One, ALJ LaChance found Plaintiff had met the SSA's insured status requirements through September 30, 2021, and had not engaged in substantial gainful activity from her alleged onset date of July 10, 2020, through her date last insured.

At Step Two, she concluded that Plaintiff had the following severe impairments: fibromyalgia and obesity. ALJ LaChance found that Plaintiff had a history of urinary

tract infections but determined it did "not meet the durational requirements to qualify as a severe impairment." (Doc. 5-1 at 24.) She acknowledged that the record "references a possible history of scleroderma" but concluded it was "not medically determinable[]" because "[a] medically determinable impairment may not be established solely on the basis of symptoms alone[]" and the "record [did] not contain a prior confirmation of the scleroderma diagnosis[.]" *Id.* In addition, ALJ LaChance noted that Plaintiff contracted COVID-19 in December 2021 and subsequently "developed long-haul [COVID] symptoms," but because the "issue developed after [Plaintiff's] date last insured . . . this impairment was not medically determinable during the relevant period." *Id.* Finally, she acknowledged Plaintiff's testimony "that [Plaintiff] has a history of anxiety, depression, and panic attacks[]" but found insufficient evidence to establish these mental impairments because the record lacked evidence of treatment and evaluations "focused on mental impairments during the relevant period[.]"[3] *Id.*

At Step Three, ALJ LaChance found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listings. Recognizing that fibromyalgia is not a listed impairment, the ALJ considered whether Plaintiff's "impairments medically equal other relevant listings, such as 14.09D[,]" but determined that they did not since "the record does not show that [Plaintiff] had at least two constitutional symptoms or signs." *Id.* The ALJ acknowledged that Plaintiff "complained of fatigue, but [Plaintiff] did not exhibit fever, malaise, or involuntary weight loss[.]" *Id.* at 24-25. Regarding Plaintiff's obesity (BMI of 31.57 kg/m$^2$), the ALJ cited Social Security Ruling 19-2p and noted that she "considered the effects of [Plaintiff's] obesity not only under the listings, but also when assessing the claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity." (Doc. 5-1 at 25.)

At Step Four, ALJ LaChance determined Plaintiff had the residual functional capacity ("RFC") to:

---

[3] This finding accords with Plaintiff's reports to her providers that she could not work due to chronic pain and fatigue, rather than due to any mental impairments.

perform light work as defined in 20 CFR 404.1567(b) except that, the [Plaintiff] could not climb ladders, ropes, or scaffolds. She could occasionally climb ramps and stairs. She could occasionally balance, stoop, kneel, crouch, or crawl. The [Plaintiff] needed to avoid concentrated exposure to cold, wetness, and vibration. She needed to avoid hazards, such as unprotected heights and dangerous machinery. She could perform simple tasks.

*Id.*

At the May 4, 2023 hearing, the ALJ asked the VE hypothetical questions regarding the jobs available to a person of Plaintiff's age, education, and work experience, with an RFC that included a limitation that Plaintiff "cannot perform work requiring a specific production rate such as assembly line work or work that requires hourly quotas." *Id.* at 67. The VE opined that Plaintiff would not be able to return to her past work as a home attendant. When asked whether other jobs would be available, the VE identified marker, order caller, and labeler. When asked specifically about sedentary jobs, the VE testified that work as a document preparer, addresser, and charge account clerk would also be available.[4] In her decision, ALJ LaChance acknowledged that "[t]he [RFC] outlined [in her decision] does not match the hypothetical posed to the vocational expert, with one limitation removed." *Id.* at 28. However, she found that "[t]his change does not change the finding that the claimant would not be able to perform past relevant work." *Id.* She also stated that because the RFC determination of her opinion "is less

_____

[4] "[N]umerous courts have recognized [that] the document preparer and addresser clerk jobs are obsolete[.]" *Paul Thomas C. v. Comm'r of Soc. Sec.*, 2024 WL 4688875, at *4 (S.D.N.Y. Nov. 5, 2024). To meet the burden at Step Five, "the Commissioner need show only one job existing in the *national economy* that claimant can perform." *Lillis v. Colvin*, 2017 WL 784949, at *6 (D. Conn. Mar. 1, 2017) (internal quotation marks and alteration omitted) (emphasis in original) (quoting *Bavaro v. Astrue*, 413 F. App'x 382, 384 (2d Cir. 2011)); *see also Consiglio v. Berryhill*, 2018 WL 1046315, at *8 (D. Conn. Feb. 26, 2018) ("[T]he number of jobs available in the local economy is not relevant, because the ALJ determined plaintiff could have performed a significant number of jobs in the national economy.") (citation omitted).
Although "[w]ithin the Second Circuit 'courts have refused to draw a bright line standard for the minimum number of jobs required to show that work exists in significant numbers[,]'" *Koutrakos v. Colvin*, 2015 WL 1190100, at *21 (D. Conn. Mar. 16, 2015) (internal quotation marks omitted) (citing *Barbato v. Astrue*, 2010 WL 2710521, at *7 (W.D.N.Y. July 7, 2010)), "[c]ourts have adopted a relatively low threshold number." *Barbato*, 2010 WL 2710521, at *7.

limiting tha[n] the hypothetical [RFC] posed to the [VE,] . . . [i]t stands to reason that [Plaintiff] would still be able to perform the identified jobs with a less-limiting [RFC] than the one considered by the [VE]." *Id.* at 29.

At Step Five, ALJ LaChance determined that jobs exist in significant numbers in the national economy that Plaintiff could perform through the date last insured, including marker (approximately 189,000 jobs nationally), order caller (approximately 13,000 jobs nationally), and labeler (approximately 30,000 jobs nationally). As a result, ALJ LaChance concluded Plaintiff was not disabled.

## III.    Conclusions of Law and Analysis.

### A.    Standard of Review.

In reviewing the Commissioner's decision, the court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (citation and internal quotation marks omitted). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks omitted).

It is the Commissioner who resolves evidentiary conflicts, and the court "will not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *see also Burgess*, 537 F.3d at 128 (noting "genuine conflicts in the medical evidence are for the Commissioner to resolve[.]") (alteration adopted) (internal quotation marks and citation omitted). Even if the court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision when it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.").

The court does not defer to the Commissioner's decision "[w]here an error of law has been made that might have affected the disposition of the case[.]" *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted) (first alteration in original). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision*." Jason F. v. O'Malley*, 2024 WL 1756547, at *4 (D. Vt. Apr. 23, 2024) (internal quotation marks omitted) (quoting *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009)).

**B.    Whether the ALJ Erred in Evaluating Plaintiff's Fibromyalgia.**

Although ALJ LaChance determined Plaintiff's fibromyalgia was a severe impairment, Plaintiff argues that the ALJ's analysis was erroneous because the ALJ failed to evaluate her fibromyalgia under Social Security Ruling 12-2p ("SSR 12-2p") and include her fibromyalgia symptoms in her RFC. Plaintiff asserts that this error was not harmless because it caused the ALJ to give too little weight to the opinion of treating sources Dr. Katherine Mariani and Dr. Laura Paxton, each of whom opined that Plaintiff would be limited by work-preclusive off-task time and absenteeism. The Commissioner counters that the ALJ's analysis was consistent with SSR 12-2p, as the ALJ "explicitly considered" Plaintiff's fibromyalgia symptoms, "found that her fibromyalgia was a severe impairment[,]" and "found that [Plaintiff's] fibromyalgia caused exertional and non-exertional limitations and, thus, . . . limited [Plaintiff] to a range of light work with postural and environmental restrictions." (Doc. 18 at 10-11).

SSR 12-2p describes the evidence needed to establish fibromyalgia as a medically determinable impairment. SSR 12-2p, 2012 WL 3104869 (July 25, 2012). It states that "[b]ecause the symptoms and signs of [fibromyalgia] may vary in severity over time and may even be absent on some days, it is important that the medical source who conducts the [consultative examination] has access to longitudinal information about the person." *Id.* at *5. Regarding the RFC assessment, it explains that "[f]or a person with [fibromyalgia], we will consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" *Id.* at *6. SSR 12-2p directs the ALJ to consider that "[w]idespread pain and

7

other symptoms associated with [fibromyalgia], such as fatigue, may result in exertional limitations that prevent a person from doing the full range of unskilled work in one or more of the exertional categories" and that people with fibromyalgia "may also have nonexertional physical or mental limitations" or "environmental restrictions[.]" *Id.* In such instances, ALJs are instructed to "use the rules in appendix 2 as a framework for decision-making and may need to consult a vocational resource." *Id.*

In explaining why she found the limiting effects of Plaintiff's fibromyalgia symptoms were less severe than alleged by Plaintiff, ALJ LaChance noted that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (Doc. 5-1 at 26.) The ALJ stated that she gave Plaintiff "the benefit of the doubt regarding her testimony about pain, fatigue, [and] brain fog," and on that basis limited Plaintiff to simple tasks, but concluded "the evidence does not support limitations to the extent alleged." *Id.* The RFC thus did not include limitations concerning off-task time, work absences, or additional rest breaks. Plaintiff argues that such a determination fails to consider SSR 12-2p's guidance "that 'widespread pain and other symptoms associated with [fibromyalgia], such as fatigue, may result in exertional limitations that prevent a person from doing the full range of unskilled work' and . . . 'nonexertional physical and mental limitations[.]'" (Doc 12-1 at 12-13) (first alteration in original) (citing SSR 12-2p at *6).

In this case, ALJ LaChance considered Plaintiff's fibromyalgia symptoms in rendering an RFC determination by including postural, environmental, and mental restrictions. Insofar as the ALJ found certain fibromyalgia symptoms less disabling than Plaintiff claimed, she weighed the fact that Plaintiff sought minimal treatment for her fibromyalgia during the relevant period. *See, e.g.,* Doc. 5-1 at 425 (May 25, 2022 treatment note stating Plaintiff "was last seen in rheumatology at UVM on 6/22/2016"). She also cited treatment notes spanning 2016 to 2021 that showed only general body tenderness and a generally normal range of motion in Plaintiff's extremities. *See, e.g., id.* at 577 (June 20, 2016 treatment notes record 18/18 fibromyalgia tender points, but no

significant tenderness or limited range of motion in any extremity); *id.* at 387 (June 1, 2021 treatment notes report general tenderness and edema, limited range of motion in shoulder, tender with soft touch of extremities and back). ALJ LaChance compared treatment notes during the relevant period with treatment notes after the date last insured of September 30, 2021, to determine whether Plaintiff's symptoms significantly changed after she contracted COVID-19 in December 2021 and concluded that they did. *See, e.g., id.* at 424 (June 20, 2022 treatment notes state Plaintiff reported her December 2021 COVID-19 infection "made everything worse[,]" that the "[p]ain increased[] [d]ramatically[,]" and she was also experiencing memory issues, headaches, and vertigo). This accords with SSR 12-2p's directive that an ALJ "consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane[.]" 2012 WL 3104869, at *6.

Consistent with SSR 12-2p, the ALJ also considered "all of the evidence in the case record," including Plaintiff's testimony regarding her pain, fatigue, brain fog, and poor sleep. *Id.* at *5. Although Plaintiff disagrees with the ALJ's conclusions, this is not a case where the ALJ failed to consider Plaintiff's symptoms in determining exertional and non-exertional limitations. ALJ LaChance's evaluation of Plaintiff's fibromyalgia symptoms was therefore consistent with SSR 12-2p and supported by substantial evidence.

### C.    Whether the ALJ Failed to Properly Assess the Supportability and Consistency of the Opinions of Dr. Mariani and Dr. Paxton.

Plaintiff argues ALJ LaChance erred in assessing the supportability and consistency of the opinions of Dr. Mariani and Dr. Paxton and that substantial evidence does not support the ALJ's conclusion that their opinions are unpersuasive. She asserts that these errors were not harmless because the opinions of Dr. Mariani and Dr. Paxton support a finding of preclusive off-task time and work absences. The Commissioner responds that the ALJ reasonably evaluated the opinions of Dr. Mariani and Dr. Paxton and substantial evidence supports the ALJ's determination that they are unpersuasive.

"When making a determination of disability, an ALJ must consider all of the available evidence in the individual's case record, including the opinions of medical sources." *Karen S. v. Comm'r of Soc. Sec.*, 2020 WL 4670911, at *13 (D. Vt. Aug. 11, 2020) (internal quotation marks, alteration, and citation omitted). An ALJ must articulate *how* they considered medical opinions and prior administrative findings, as well as *how persuasive* they found them. 20 C.F.R. §§ 404.1520c(a)-(b), 416.920c(a)-(b).

An ALJ "will not defer or give any specific evidentiary weight . . . to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* §§ 404.1520c(a), 416.920c(a). Instead, an ALJ must consider each medical opinion or prior administrative finding in the record and evaluate its persuasiveness in accordance with five factors: (1) supportability; (2) consistency; (3) relationship with the claimant (including: (i) length of treatment relationship, (ii) frequency of examinations, (iii) purpose of treatment relationship, (iv) extent of treatment relationship, and (v) examining relationship); (4) specialization; and (5) other factors that tend to support or contradict a medical opinion or prior administrative medical finding. *See id.* §§ 404.1520c(c), 416.920c(c).

The factors of supportability and consistency "are the most important factors [an ALJ] consider[s]" when determining the persuasiveness of a medical opinion. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). An ALJ must therefore articulate how he or she considered the supportability and consistency of a medical opinion and may, but need not, address the remaining three factors. *Id.* "[W]hen the record contains competing medical opinions, it is the role of the Commissioner to resolve such conflicts." *Diana C. v. Comm'r of Soc. Sec.*, 2022 WL 1912397, at *7 (S.D.N.Y. Apr. 11, 2022) (citing *Veino*, 312 F.3d at 588). Supportability refers to "how well a medical source supported and explained their opinion[,]" and "consistency is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record." *Vellone ex rel. Vellone v. Saul*, 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021).

On May 13, 2016, at the request of Dr. Katherine Mariani, Plaintiff's primary care provider, Plaintiff sought a "rheumatological evaluation for diffuse joint pains . . . for [seven] years and [an] elevated [antinuclear antibody ("ANA")] titer of 1:640 with diffuse and speckled pattern[]" from Dr. Syeda Sayeed, a rheumatologist. (Doc. 5-1 at 596.) Plaintiff reported feeling "stiff all over her body throughout the day[,]" poor sleep, and fatigue. *Id.* A musculoskeletal exam documented "no significant tenderness" in Plaintiff's spine, shoulder/elbow, wrist/hand, hips/knee, and ankle/foot, and "[b]ilateral fibromyalgia tender points 18/18." *Id.* at 598. The range of motion was normal for all areas examined, and there was "no significant tenderness, swelling, effusions, erythema or warmth . . . present" in Plaintiff's shoulder/elbow, wrist/hand, hips/knee, and ankle/foot. *Id.* Plaintiff was described as in "[n]o acute distress." *Id.* Dr. Sayeed opined that Plaintiff's examination was "consistent with myofascial pain syndrome like fibromyalgia[]" and prescribed aquatic therapy. *Id.* at 599.

On June 20, 2016, Plaintiff had a follow-up appointment with Dr. Sayeed to review lab results. Plaintiff reported fatigue but "[d]enie[d] fever, chills, night sweats, oral ulcers, rash, photosensitivity, sicca or [R]aynaud's symptoms[.]" (Doc. 5-1 at 576-77.) A physical examination again showed no significant tenderness but did show "[p]ositive fibromyalgia tender points 18/18 bilaterally." *Id.* at 577. Dr. Sayeed again opined that Plaintiff's examination was "consistent with myofascial pain syndrome or fibromyalgia[]" and recommended aquatic therapy. *Id.* at 578, 576.

Approximately five years later, on June 1, 2021, Dr. Mariani evaluated Plaintiff to address her reported chronic pain. She noted that Plaintiff's "[c]hronic pain increased recently impacting function and quality of life." *Id.* at 384. A physical examination showed "[t]enderness and edema present. . . . Limited range of [m]otion of shoulder. Tender with soft touch of [extremities] and back." *Id.* at 387. Dr. Mariani recorded a loss of strength and movement in Plaintiff's right arm and noted that Plaintiff reported experiencing severe pain, fatigue, and numbness, as well as swelling in her fingers and difficulty working. She described Plaintiff as in "acute distress[.]" *Id.* at 386.

On May 25, 2022, after Plaintiff's date last insured of September 30, 2021, Plaintiff visited Dr. Laura Paxton, a rheumatologist, "for [an] evaluation of chronic pain, fibromyalgia, [and positive] ANA [test]." (Doc. 5-1 at 583.) Notes from the visit state that "[o]ver the years the pain progressed in severity and became generalized" and that Plaintiff "noted worsening diffuse myalgias, arthralgias, and fatigue[]" after a COVID-19 infection in December 2021. *Id.* at 584. Plaintiff also reported new symptoms, including brain fog and imbalance, which Plaintiff had been told were "likely due to long COVID." *Id.* She told Dr. Paxton that "she cannot work due to the chronic pain and fatigue." *Id.* A physical examination showed "[d]iffuse tenderness . . . without swelling" in Plaintiff's hands, "[s]oft tissue tenderness" in her elbows, "[m]ildly reduced range of motion" and tenderness in her shoulders, "[s]oft tissue tenderness over the neck, upper back, and lower back," "[s]oft tissue tenderness bilaterally" in her chest wall, "[t]enderness over the bilateral trochanteric bursa" in her hips, and tenderness and mild crepitus in her knees. *Id.* at 587. Dr. Paxton noted that these tender points were consistent with fibromyalgia and that Plaintiff's report that her symptoms had worsened after her COVID-19 infection was "something [Dr. Paxton had] seen in other fibromyalgia patients." *Id.* at 589.

Plaintiff saw Dr. Mariani again on June 20, 2022, and reported that her COVID-19 infection had "[d]ramatically" exacerbated her fibromyalgia symptoms. (Doc. 5-1 at 424.) Plaintiff also reported memory issues and vertigo, which she had not reported in earlier consultations with Dr. Mariani.

On July 1, 2022, state agency medical consultant Dr. Geoff Knisely reviewed the medical evidence available for the period prior to September 30, 2021, and filled out a checklist indicating "yes" to certain exertional limitations including that Plaintiff was limited to lifting or carrying twenty pounds occasionally and ten pounds frequently, walking and standing for six hours in an eight-hour workday, and sitting for six hours in an eight-hour workday. He responded "no" to questions inquiring whether Plaintiff had postural, manipulative, visual, communicative, or environmental limitations. Nothing on the form expressly inquired into off-task time, absenteeism, or the need for additional work breaks, and Dr. Knisely provided no comments on those issues. Dr. Knisely

concluded that Plaintiff's "statements about the intensity, persistence, and functionally limiting effects of the symptoms [are] substantiated by the objective medical evidence alone[.]" *Id.* at 74.

On reconsideration in November 2022, state agency medical consultant Dr. Edward Haak reviewed the medical evidence available and concluded that in addition to the exertional limitations determined by Dr. Knisely, Plaintiff was also subject to postural and environmental limitations. The postural limitations included restrictions on Plaintiff's ability to climb ladders, ropes, and scaffolds, while the environmental limitations instructed Plaintiff to avoid extreme cold, wetness, vibration, and hazards like machinery and heights. He indicated that Plaintiff did not have manipulative, visual, or communicative limitations. Dr. Haak made no observations regarding off-task time, absenteeism, or the need for additional work breaks, and the form he completed did not ask about these limitations. Unlike Dr. Knisely, Dr. Haak concluded that Plaintiff's statements about her symptoms were not "substantiated by the objective medical evidence alone" and were only "[p]artially consistent" with the medical and non-medical evidence. *Id.* at 81. He opined Plaintiff reported symptoms "of greater severity than is supported by the medical evidence." *Id.*

In a medical source statement dated April 10, 2023, Dr. Mariani determined that, on or before Plaintiff's last insured date of September 30, 2021, Plaintiff suffered from fibromyalgia which caused chronic pain, fatigue, an inability to stand or sit for long, and dizziness. Citing Plaintiff's elevated ANA and previous diagnosis of fibromyalgia by a rheumatologist, she opined that there is "[n]o effective treatment and no definite lab or x[-]ray testing" for fibromyalgia. *Id.* at 569. She concluded Plaintiff could not work around hazards and was unable to handle routine, repetitive tasks, detailed or complicated tasks, strict deadlines, or fast-paced tasks. Stating that Plaintiff's impairments would limit her concentration, persistence, and pace, Dr. Mariani predicted that Plaintiff would be off-task more than twenty percent of the workday, experience four or more absences from work per month, and require additional rest breaks of twenty minutes eight times per day. Dr. Mariani based her recommended limitations on her knowledge of Plaintiff's

impairments having "seen her multiple times a year and [finding] her symptoms [and] presentation [to be] consistent [and] unchanged." *Id.* at 571.

In a medical source statement dated March 31, 2023, Dr. Paxton found that, on or before Plaintiff's date last insured, Plaintiff had a history of widespread pain in joints, muscles, tendons, or nearby soft tissue that had persisted for at least three months. In a checklist, she noted Plaintiff had fibromyalgia symptoms of muscle pain, fatigue or tiredness, cognitive or memory problems, fibromyalgia fog, numbness or tingling, dizziness, insomnia, nervousness, waking unrefreshed, depression, and anxiety. She reported that Plaintiff had fourteen tender points and that Plaintiff's fibromyalgia impaired her concentration, persistence, and pace and made it difficult to complete even sedentary tasks. Dr. Paxton acknowledged that Plaintiff had flares of fibromyalgia symptoms with an unknown frequency and that it is "[u]nknown how long a severe flare will last but [the] general condition will last for years." (Doc. 5-1 at 626.) Dr. Paxton recorded Plaintiff's statement that "she cannot work due to pain and fatigue." *Id.* In response, Dr. Paxton noted "treatment for fibromyalgia include[s] exercise" and that she "typically do[es] not remove patients from work for fibromyalgia." *Id.* In a medical source statement dated April 19, 2023, Dr. Paxton determined that Plaintiff would be off-task ten to fifteen percent of the workday and experience about two absences per month but would not need additional rest breaks.

At the May 4, 2023 ALJ hearing, the VE testified that for an unskilled job, the maximum tolerance for being off-task was ten percent of the workday and the maximum tolerance for being absent from work was one day per month. The VE also testified that for the jobs identified (marker, order caller, and labeler), the worker would need to be at the work-station to perform the jobs and that walking away from the work-station would be considered off-task time.

In her August 23, 2023 decision, ALJ LaChance analyzed the opinions of Drs. Mariani and Paxton collectively, finding both unpersuasive because they were "not consistent with or supported by the medical evidence of record." *Id.* at 27. The ALJ stated three justifications for her determination: (1) Plaintiff "received little treatment for

fibromyalgia or obesity prior to the date last insured"; (2) "[t]he few examinations during the relevant period only showed general tenderness, with mild shoulder motion limitations"; and (3) Plaintiff "did not complain of a significant increase in symptoms until after the date last insured[.]" *Id.* With respect to Dr. Paxton's opinion, the ALJ also noted that there was "no indication that Dr. Paxton examined [Plaintiff] during the relevant period."[5] *Id.* ALJ LaChance concluded that these factors "do not support the significant limitations these providers assessed during the period at issue." (Doc. 5-1 at 27.)

### 1.    Whether the ALJ Erred by Failing to Consider the Consistency Between the Opinions of Dr. Mariani and Dr. Paxton.

The Commissioner does not directly address Plaintiff's argument that the opinions of Dr. Mariani and Dr. Paxton both recognize the likelihood of significant off-task time and absenteeism. It, instead, focuses on the opinions' alleged inconsistencies with the overall record.

Courts within the Second Circuit have regularly found that "[a]n ALJ's failure to consider the consistency of the physicians' opinions with each other . . . constitutes legal error." *Navedo v. Kijakazi*, 616 F. Supp. 3d 332, 349 (S.D.N.Y. 2022) (second alteration in original) (internal quotation marks omitted) (citing *Williams v. Saul*, 2020 WL 6385821, at *13 (S.D.N.Y. Oct. 30, 2020)). In *Denver v. Berryhill*, the Southern District

---

[5] Plaintiff contends ALJ LaChance impermissibly relied on the fact that Dr. Paxton did not examine Plaintiff and asserts "Dr. Paxton's opinions were based on her personal knowledge of [Plaintiff's] medical condition and a review of the medical records on or before [Plaintiff's] last insured date of September 30, 2021." (Doc. 12-1 at 14.) Dr. Paxton first evaluated Plaintiff on May 25, 2022, approximately twenty-two months after the alleged onset date and eight months after the date last insured. This court has noted that, in certain circumstances, a "'diagnosis of a claimant's condition may properly be made even several years after the actual onset of the impairment,' and by a physician who had not theretofore treated the claimant." *Jenifer S. o/b/o Ronald S. v. Comm'r of Soc. Sec.*, 2019 WL 102102, at *9 (D. Vt. Jan. 4, 2019) (quoting *Parker v. Harris*, 626 F.2d 225, 232 (2d Cir. 1980)). Assuming *arguendo* that the ALJ erred by discounting Dr. Paxton's opinion because she examined Plaintiff after the date last insured, the error is harmless if substantial evidence supports the ALJ's conclusion that Dr. Paxton's opinions are unpersuasive. *Parker*, 626 F.2d at 232 (finding that physicians who examined claimant after date last insured "were in the best position to evaluate [claimant's] condition, and their opinions must be credited if there is no substantial evidence to contradict them[]").

of New York held that the ALJ committed legal error "by considering—and rejecting—[medical] opinions *together*[]" and thereby "fail[ing] to give any weight to the fact that these opinions are consistent with other medical evidence in the record because *they are consistent with one another*." 2020 WL 2832752, at *2 (S.D.N.Y. June 1, 2020) (emphasis in original). The Northern District of New York similarly found procedural error when the ALJ discussed medical opinions' consistency with other findings in the record, but not with each other. *Darrell J. v. Comm'r of Soc. Sec.*, 2024 WL 2028022, at *2 (N.D.N.Y. Mar. 8, 2024).[6] "Failure to properly assess the consistency factor is procedural error subject to harmless error analysis." *Id.* at *2 (citing *Schillo v. Kijakazi*, 31 F.4th 64, 75 (2d Cir. 2022)).

Dr. Mariani opined that Plaintiff would be off-task more than twenty percent of the workday, experience four or more absences from work per month, and require additional rest breaks of twenty minutes eight times per day. In contrast, Dr. Paxton predicted that Plaintiff's fibromyalgia would cause her to be off-task ten to fifteen percent of the workday and absent approximately twice a month. She did not believe Plaintiff would require additional rest breaks during the workday. She also opined that she does not typically remove patients from work for fibromyalgia.

In her decision, ALJ LaChance acknowledged and recounted the off-task time, work absence, and additional work break estimates of both Dr. Mariani and Dr. Paxton but concluded that Plaintiff's minimal treatment, reports of mild symptoms, and reported increase in symptoms after the date last insured did not support greater limitations to Plaintiff's RFC. Although ALJ LaChance did not explicitly acknowledge that the opinions of Drs. Mariani and Paxton were consistent in predicting a substantial level of off-task time and absenteeism, she was entitled to find the opinions inconsistent with

---

[6] *Cf. Shawn H. v. Comm'r of Soc. Sec.*, 2020 WL 3969879, at *8 (D. Vt. July 14, 2020) (finding a lack of substantial evidence for ALJ's determination that medical opinions were entitled to only partial weight when he failed to consider that medical opinions were consistent with each other as well as with the record); *see also* 20 C.F.R. § 404.1520c(c)(2) ("The more consistent a medical opinion[ ] . . . is with the evidence from other medical sources[,] . . . the more persuasive the medical opinion[ ] . . . will be.").

each other and the record as a whole, which did not contain other opinions of this nature. ALJ LaChance therefore properly assessed the consistency between the opinions and the record.

**2.    Whether Substantial Evidence Supports the ALJ's Conclusion that the Opinions of Dr. Mariani and Dr. Paxton Are Unpersuasive.**

Plaintiff challenges the ALJ's cited justifications of minimal evidence, mild symptoms during the relevant period, and increase in symptoms after the date last insured as insufficient to establish substantial evidence that the opinions of Dr. Mariani and Dr. Paxton are unpersuasive. The Commissioner responds that the ALJ's determination is supported by substantial evidence and the court is not entitled to re-weigh the evidence.

Plaintiff asserts that the ALJ's reliance on her minimal treatment ignores the "relatively short period of time of just over a year" between her alleged onset date and date last insured. (Doc. 19 at 3.) Plaintiff was first diagnosed with fibromyalgia in June 2016. There is no evidence that Plaintiff sought treatment for her fibromyalgia between her first diagnosis and her June 2021 appointment with Dr. Mariani. Plaintiff's next visit to a medical professional to address her fibromyalgia was her May 2022 appointment with Dr. Paxton. An ALJ may consider a claimant's lack of treatment during the relevant period when evaluating a claimant's disability. *See David W. T. v. Comm'r of Soc. Sec.*, 2022 WL 3927887, at *10 (W.D.N.Y. Aug. 31, 2022) (finding plaintiff's failure to seek treatment supported the ALJ's determination that plaintiff did not have a disability); *Matos v. Comm'r of Soc. Sec.*, 2025 WL 1696893, at *9 (E.D.N.Y. June 17, 2025) (observing "[p]laintiff's failure to seek medical treatment during the period at issue undercuts a finding of disability[]") (internal quotation marks and citation omitted); *Arnone v. Bowen*, 882 F.2d 34, 39 (2d Cir. 1989) ("In rejecting [plaintiff's] proof of a continuous disability as insufficient, the Secretary properly attributed significance to [plaintiff's] failure to seek any medical attention during the crucial 1977-80 period."). ALJ LaChance therefore did not err in considering Plaintiff's minimal treatment during

the relevant period in assessing the persuasiveness of opinions based on that limited treatment.

Plaintiff also argues that ALJ LaChance mischaracterized medical evidence in Dr. Mariani's June 1, 2021 treatment notes. She cites Dr. Mariani's comments that Plaintiff reported experiencing severe pain and difficulty working prior to the COVID-19 pandemic, fatigue, numbness, and swelling in her fingers. Treatment notes documenting these symptoms, however, are based solely on Plaintiff's self-reports. "Although an ALJ may not 'reject a medical source's opinion solely because it relies on subjective complaints, he or she may assign a treating source's opinion little weight if it is based on a claimant's questionable, subjective complaints.'" *Jason F.*, 2024 WL 1756547, at *7 (quoting *Georgiana W. v. Comm'r of Soc. Sec.*, 2021 WL 2809553, at *9 (W.D.N.Y. July 6, 2021)) (finding ALJ did not err in rejecting medical opinion based on claimant's subjective complaints when ALJ concluded those subjective complaints were not credible).[7] The ALJ relied on Dr. Mariani's observations that Plaintiff presented with "[t]enderness and edema" and "[l]imited range of [m]otion of [her] shoulder[]" (Doc. 5-1 at 387) and did not err in crediting Dr. Mariani's medical examination over Plaintiff's historical and subjective self-reports. *See Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 578 (S.D.N.Y. 2022) ("With respect to the supportability factor, the strength of a medical opinion increases as the relevance of the objective medical evidence and explanations presented by the medical source increase.") (internal quotation marks and citation omitted).

Plaintiff next contends that an increase in her fibromyalgia symptoms after contracting COVID-19 in December 2021 "is not inconsistent with significant disabling symptoms prior to that time[.]" (Doc. 19 at 2.) This misses the mark. The question is not whether it is possible that her symptoms preceded her diagnosis with COVID-19; it is

---

[7] *Cf. Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) ("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, . . . but is not required to accept the claimant's subjective complaints without question; [the ALJ] may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." (internal citations omitted).

whether the ALJ erred in finding that Plaintiff's symptoms worsened as a result of her COVID-19 infection. Plaintiff, herself, admitted that her bout with COVID-19 after her last insured date substantially increased her fibromyalgia symptoms. "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre*, 758 F.3d at 149.

In summary, ALJ LaChance's determination that the opinions of Dr. Mariani and Dr. Paxton were not consistent with or supported by the medical evidence of record was supported by substantial evidence, even if this court could reach a different conclusion. *See Smith v. Colvin*, 17 F. Supp. 3d 260, 264-65 (W.D.N.Y. 2014) ("Even where there is substantial evidence in the record weighing against the Commissioner's findings, the determination will not be disturbed so long as substantial evidence also supports it."). "It is the Commissioner who resolves evidentiary conflicts and determines credibility issues, and the court 'should not substitute its judgment for that of the Commissioner.'" *Susan B. v. Comm'r of Soc. Sec.*, 515 F. Supp. 3d 225, 232 (D. Vt. 2021) (quoting *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998)).

**D.    Whether the ALJ Erred in Failing to Make Findings on Plaintiff's Off-Task Time, Work Absences, and Need for Additional Rest Breaks.**

Plaintiff asserts that ALJ LaChance erred in failing to make findings regarding off-task time, work absences, and the need for additional rest breaks in the context of state agency opinions and the record as a whole. The Commissioner argues these findings are not required because Dr. Mariani and Dr. Paxton were the only sources to opine such limitations and the ALJ reasonably determined their opinions were unpersuasive.

Both Dr. Mariani and Dr. Paxton predicted that Plaintiff's fibromyalgia would cause her to experience work-preclusive off-task time and work absences. Dr. Mariani also opined that Plaintiff would require additional rest breaks during the workday. The forms state agency reviewers Drs. Knisely and Haak completed posed no inquiry into off-task time, absenteeism, or additional work breaks. In addition, Dr. Knisely and Dr. Haak made no observations regarding these topics. ALJ LaChance subsequently found Dr. Haak's opinion persuasive, Dr. Knisely's opinion partially persuasive, and Dr. Mariani's

and Dr. Paxton's opinions unpersuasive, and assessed an RFC that did not include restrictions addressing off-task time, absenteeism, or additional work breaks.

Although there were substantial reasons for rejecting the opinions of Drs. Mariani and Paxton, the ALJ failed to develop the record by asking the state agency consultants to address the issues of off-task time, absenteeism, and additional work breaks. "It is the rule in our circuit that the . . . ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009) (internal quotation marks and alterations omitted); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (observing that an ALJ has an obligation to develop the record because "of the non-adversarial nature of . . . benefits proceedings"); *Echevarria v. Sec'y of Health & Hum. Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (noting that "the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record"). For this reason, the ALJ has a duty to resolve "gaps in the administrative record[.]" *Hankerson v. Harris*, 636 F.2d 893, 897 (2d Cir. 1980) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)). "An ALJ's failure to develop the record warrants remand." *Guillen v. Berryhill*, 697 F. App'x 107, 108 (2d Cir. 2017) (citation omitted).

The error was not harmless because Dr. Mariani and Dr. Paxton were the only sources to assess Plaintiff's off-task time, absenteeism, and need for additional work breaks, and although not wholly consistent, both opined this would substantially impede Plaintiff's ability to perform full-time work. In addition, because Dr. Knisely and Dr. Haak differed as to whether Plaintiff's degree of symptoms was supported by the record, the ALJ's inquiry regarding these topics may have revealed further differences between the two opinions. In turn, a fulsome evaluation of this issue may have altered Plaintiff's RFC and the ALJ's disability determination in light of VE Eng's testimony that an employer would not tolerate a worker being off-task more than ten percent of the workday or absent from work more than once per month. *See Beck v. Colvin*, 2013 WL 5533571, at *6 (W.D.N.Y. Oct. 7, 2013) ("Vocational experts in Social Security cases have testified that missing three or more days of work per month renders a claimant

unemployable, as that level of absenteeism is beyond the bounds of reasonable employer tolerance.") (citation omitted); *Edwards v. Comm'r of Soc. Sec.*, 2020 WL 4784583, at *4 (W.D.N.Y. Aug. 18, 2020) (observing that "[t]he percent of off-task time was absolutely critical to the disability determination" where a VE testified that if a plaintiff's time off-task was ten percent or more, such limitation would be "work preclusive") (internal quotation marks and citation omitted). A remand is therefore required to address this issue.

**CONCLUSION**

For the reasons stated above, Plaintiff's motion to reverse the decision of the Commissioner is GRANTED (Doc. 12), the Commissioner's motion to affirm is DENIED (Doc. 18), and the case is REMANDED for proceedings consistent with this Opinion and Order.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this ___7th___ day of October, 2025.

Christina Reiss, Chief Judge
United States District Court